UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Carmalita Blountt,

      Plaintiff,

v.

Commissioner of Social Security
Administration,

      Defendant.
_____

Civil No. 07-cv-3871 (DSD/JJG)

**REPORT AND RECOMMENDATION**

This is Plaintiff Carmalita Blountt's ("Blountt") action for review of the Defendant Social Security Administration's denial of her application for supplemental security income ("SSI") benefits based on disability. It is before the Court on cross-motions for summary judgment. *See* Doc. Nos. 8, 13. The motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636 and D. Minn. LR 72.1.

For the reasons set forth below, the Court recommends that Blountt's motion for summary judgment be denied, and that the Defendant's motion for summary judgment be granted.

**I.    BACKGROUND**

    **A.    Procedural History**

Blountt is 34 years old, and applied for SSI benefits based on January 23, 2004. Tr. at 64.[1] The basis of her application was that she suffers from daily severe headaches, asthma, and ankle problems. *Id.* at 137. She stated that she became disabled on June 25, 2003. *Id.* at 77.

---

[1] The Court references the administrative transcript in this matter as "Tr."

Blount's application was denied initially, and upon reconsideration. *Id.* at 38, 41. Blount appealed, and requested a hearing before an ALJ. The hearing was held on October 5, 2006, in Minneapolis, Minnesota. *Id.* at 479. A medical expert, neurologist Dr. Joel Gedan, testified at the hearing. *Id.* at 13.

On December 4, 2006, the ALJ denied Blountt's application for benefits. *Id.* at 13-25. The ALJ found that Blountt was severely impaired by "headaches, a history of obesity with past bypass surgery, and mild chrondomalacia[2] possibly resulting in knee pain." *Id.* at 16. She determined that Blount was capable of light work as follows:

> Unskilled and no rapidly paced tasks, such as tasks on a constant moving assembly belt, lifting 10 pounds frequently and 20 pounds occasionally, sitting six hours total out of eight hours, standing/walking four hours each out of eight hours with a brief change of position after 30 minutes, occasional bending, squatting, kneeling, crouching, and crawling, no climbing of ladders, no repetitive work with arms extended, such as at a keyboard, and no repetitive neck motion or prolonged flexed or extended position of the neck, such as microscopic work.

*Id.* at 18. The ALJ then determined that, although Blountt was unable to perform her past relevant work,[3] her RFC allowed her to perform a significant number of jobs in the regional or national economy. Accordingly, the ALJ determined that Blountt was ineligible for SSI benefits. *Id.* at 24.

Blount requested the Appeals Council's review of the ALJ's decision, which the Council denied. Tr. at 6-8. Blount then filed the instant action.

**B.    Medical History**

Blountt treated with various general practitioners and specialists to address her headaches, asthma, and other concerns. The Court has reviewed the entire administrative record, but sets forth the medical history most pertinent to the instant suit here.

---

[2] Chrondomalacia is a condition affecting the cartilage surface of the back of the knee cap.
[3] Blountt was previously employed as a clerical assistant and a nursing assistant.

Blountt has suffered from chronic headaches since 2002. She testified that she has these headaches daily, and that some are worse than others. *Id.* at 488. She testified that she has her worst headaches four to five days a week, and that, when she does, she stays in bed all day. *Id.* A single mother, Blountt cares for her daughter, who was nine at the time of the benefits hearing. *Id.* at 501. She gets up with her daughter to get her ready for school, and sometimes takes her to school or picks her up. *Id.* at 502-503. Her daughter or a friend does the laundry, but she goes grocery shopping with help. *Id.* at 505. She visits family about twice month. *Id.* at 506. She pays the household bills. *Id.* at 507.

### 1.     **Neurologists Snyder and Taylor**

Starting June 4, 2003, Blountt saw neurologist Dr. Bruce Snyder regarding her headaches. Thereafter, she saw him almost monthly in 2003, and then again on February 17, 2004. *Id.* at 273-282. During this time period, Dr. Snyder and Blountt tried various treatments and medications for her headaches, including physical therapy, acupuncture, lumbar puncture, botox treatment, and numerous medications. *Id.* Blountt reported that none of these measures helped her headaches. *Id.* Snyder also performed various tests, including blood studies, two MRIs, and the lumbar puncture, all with normal results. *Id.* at 273, 286, 305, 442.

Consequently, Dr. Snyder referred Blountt to Dr. Taylor, a headache specialist at Park Nicollet's Comprehensive Headache Clinic. *Id.* at 274. Blountt saw Taylor on June 24, 2004. *Id.* at 312. Taylor concluded that Blountt suffered from chronic migraines and recommended various lifestyle adjustments as well as a trial of a new medication. *Id.* at 315.

Rather than returning to Dr. Taylor, Blountt returned to Dr. Snyder in July and December of 2004. *Id.* at 427-428. Blountt told Dr. Snyder that she was concerned regarding her health insurance coverage for Dr. Taylor. *Id.* at 427. Dr. Snyder encouraged her to return to Dr.

3

Taylor, emphasizing that he had written a referral for her to see him. At his December 14, 2004, appointment with Blountt, Dr. Taylor noted that, "Updated disability form completed for the patient." *Id.*

She next saw Dr. Snyder on January 24, 2005, and again on March 28, 2005. *Id.* at 422. On March 28, 2005, Blountt asked him to complete paperwork regarding her "disability status," which he did. *Id.* He again referred her back to Dr. Taylor. *Id.* She saw Dr. Snyder again on July 26, 2005, at which time he noted "FMLA forms completed. No additional testing warranted at this time." *Id*. at 432. Blountt may have seen Dr. Snyder again in March 2006, although this is unclear in the record. *Id.* at 434. She never returned to Dr. Taylor.

### 2. Dr. Snyder's forms

Two of the forms Dr. Snyder completed for Blountt are contained in the record. *Id.* at 345-348. They are both Department of Human Services forms entitled "Request for Adult Medical Examination." *Id.* The first is dated February 17, 2004, the second is dated December 14, 2004. On both forms, Dr. Snyder checked boxes indicating that Blountt had an illness that prevented her from working and that he expected her condition to last twelve months or longer. *Id*. When asked to estimate when Blountt could return to work, Dr. Snyder simply wrote, "disabled" on both forms. *Id.*

### 3. Later medical history

In August 2005, Blountt had gastric bypass surgery. In preparation, she underwent a psychological evaluation in December 2004. The psychologist's evaluation notes state, "She [Blountt] has trained to be a certified nursing assistant, and is presently looking for work in that occupation." *Id.* at 356. The psychologist approved Blountt for the surgery.

On December 8, 2005, Blountt was in a car accident. *Id.* at 360. She subsequently treated with a chiropractor for neck, back, and knee pain. *Id.* at 362. Her chiropractor referred her to a neurologist, Dr. Adams, for help with her headaches. Blountt saw Dr. Adams twice, once in 2006, and once in 2007. *Id.* at 454, 462. He did not directly address her limitations from her headaches or her ability to work *Id.*

### 4.  Requests for disability forms

Blountt's medical records reflect that she frequently requested that her doctors complete forms regarding her ability to work.[4] As noted above, Dr. Snyder completed such forms on numerous occasions, and two of them are contained in the record. *Id.* at 345-48. Other doctors, however, refused to complete such forms.

On May 16, 2003, approximately one month before Blountt visited Dr. Snyder, she saw Dr. Michelle Knight, a primary care physician, regarding her asthma and headaches. She asked Dr. Knight to complete paperwork stating that she was unable to work. *Id.* at 295. Dr. Knight refused, noting:

> Regarding the patient's inability to work, she did present to me a form that indicated this patient is unable to work, and I informed her that I don't ethically feel able to sign this form. She states she understands this, and she was somewhat displeased. I suggested that she could try another provider, or perhaps the neurologist would be helpful with regard to this, if they feel that her headaches are limiting her activities to such a degree that she is not able to do any sort of work.

*Id.*

---

[4] While the record contains Blountt's numerous requests for the completion of FMLA and disability forms, few of them are contained in the record. The Court notes that Blountt unsuccessfully applied for SSI disability benefits three prior times, in 1995, 2000, and 2002, Tr. 64-65, and that some of the earlier form requests could have related to such applications.

At an appointment with Dr. Knight a few months earlier, Dr. Knight noted, "She [Blountt] is able to do her normal activities with them [the headaches] but finds that it is difficult to concentrate at times when she has the headaches." *Id.* at 304.

On June 2, 2003, a couple of weeks after Dr. Knight refused to complete disability forms for Blountt, Blountt brought the forms "requesting complete disability from any type of work" to another family practice provider, Dr. Cure. *Id.* at 292. Dr. Cure also declined to complete the forms, noting, "She also brings in forms requesting complete disability from any type of work. I did not feel this was appropriate and told her I would not fill out the forms at this time." *Id.* However, a little over two weeks later, after Blountt's consultation with Dr. Snyder, Dr. Cure completed unspecified "paper work [sic] for disability." *Id.* at 288.

Earlier, in 2000, before the onset of her headaches, Blountt brought disability forms to her asthma doctor, asking that he attest to her inability to work due to asthma. Initially, the asthma doctor's nurse completed the forms. *Id.* at 211. A few days later, her doctor disagreed with his nurse's completion of the forms, stating, "I think this lady has relatively mild but relapsing asthma. It certainly isn't severe enough to prevent her from working." *Id.* at 206.

## II.   LEGAL STANDARD

When reviewing the findings of the ALJ, a court considers whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). The court must consider evidence that both favors and detracts from the decision. *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998). So long as more than a scintilla of evidence supports the ALJ's decision, that decision shall be affirmed,

even though substantial evidence may support a contrary outcome. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

## III.  ANALYSIS

Blountt contends that the ALJ made the following three errors in denying her benefits:  1) she improperly rejected her treating physician's opinion; 2) she improperly found her complaints of headache pain not entirely credible; and 3) she failed to order a consultative psychiatric exam. The Court addresses each of Blountt's arguments below.

### A.  Dr. Snyder's Opinion

Blountt contends that the ALJ improperly rejected the opinion of her treating neurologist, Dr. Snyder. In February and December 2004, Dr. Snyder completed disability forms for Blountt, concluding that she was "disabled," and checking boxes indicating that Blountt had an illness that prevented her from working and that he expected her illness to last longer than 12 months. Tr. at 345-348. The ALJ placed "little weight" on these forms in making her RFC findings. *Id.* at 20. Blountt argues that the ALJ improperly relied solely on the testifying expert's opinion, rather than the opinion of her treating neurologist, Dr. Snyder.

The Court finds that substantial evidence in the record supports the ALJ's decision to give little weight to Dr. Snyder's disability statements. First, while the Court recognizes that a treating physician's opinion is often afforded great deference, such is not the case where that opinion simply arrives at the ultimate conclusion that someone is "disabled." As the ALJ correctly reasoned, "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (*citing Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

7

While, in addition to the disability forms, the record reflects Dr. Snyder's treatment of Blountt, those records do not ineluctably lead to the disability conclusion contained in the forms he completed. Nor does he explain how arrived at that conclusion. Thus, the ALJ did not err in characterizing the forms as conclusory.

Second, in assessing the weight she placed on the disability forms Dr. Snyder completed, the ALJ considered that Dr. Snyder's treatment of Blountt tapered after 2004. Tr. at 20. While Blountt saw him frequently in the latter half of 2003, her treatment with him was less frequent in 2004 and 2005, and, at most, she saw him only once in 2006, the year of her disability benefits hearing. This is particularly curious given the fact that Blountt stated that her headaches significantly worsened after her car accident in December 2005. *E.g.*, Tr. at 454, 472. Yet the record reflects that she received only scant treatment with a neurologist after that accident.[5] Accordingly, the ALJ's determination that Dr. Snyder's 2004 opinions had grown somewhat stale two years later did not lack substantial evidence in the record.[6]

Third, as reflected in the discussion above, this is not a case where the ALJ improperly placed sole reliance on the testifying medical expert. Rather, the ALJ considered all the medical records in evidence, including those of Blountt's other treating physicians, none of whom found that Blountt was precluded from working.[7] The ALJ also considered the opinions of the state agency medical consultants, as well as that of the testifying medical expert, neurologist Dr.

---

[5] The record reflects Blountt's treatment with neurologist Dr. Adams once in 2006, and once in 2007, and a possible visit with Dr. Snyder in 2006. Tr. at 434, 454, 462.

[6] The Court notes that the ALJ incorrectly stated that Blountt's last visit with Dr. Snyder was in March 2005. Tr. at 20. The record reflects Blountt's visit to him in July 2005 (Tr. at 432), and possibly in March 2006 (Tr. 434), although the 2006 visit is unclear. The Court, however, finds that these visits do not detract from ALJ's overall observation that Dr. Snyder's treatment of Blountt tapered after 2004.

[7] While Dr. Cure reportedly completed disability paperwork in 2003, after he initially declined to do so, those papers are not in evidence.

Gedan. Thus, this is not a case, and Blountt does not appear to seriously argue, that the ALJ relied only on Dr. Gedan's opinion. *See Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 668 (8th Cir. 2003) (rejecting argument that ALJ improperly relied on testifying medical expert where the ALJ addressed the record evidence and "attempted to resolve the various conflicts and inconsistencies….").

In sum, the ALJ recognized Dr. Snyder as a treating physician, but gave his opinion that Blountt was disabled "little weight." She then set forth good reasons for doing so, including that Snyder's disability statements were conclusory, dated, and inconsistent with other record evidence. *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) ("Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight."). As discussed above, those good reasons are substantially evidenced in the record. The Court, therefore, finds no error in the ALJ's treatment of Dr. Snyder's opinion.

### B.     Credibility

Blountt raises two challenges to the ALJ's credibility findings regarding the intensity of her subjective complaints of headache pain. First, Blountt contends that the ALJ improperly relied on her activities of daily living. Second, she argues that the ALJ improperly weighed the medical expert's opinion. At bottom, Blountt argues that the ALJ improperly discounted her assertion that her headaches confine her to bed four or five days a week, rendering her unable to work. The Court finds that the ALJ's assessment of Blountt's credibility was properly made and sufficiently supported.

### 1. Activities of Daily Living

The ALJ did not too heavily rely on Blountt's activities of daily living. Rather, the ALJ was concerned that Blountt's testimony at the benefits hearing was inconsistent.

Blountt first testified that she stayed in bed all day four to five days a week due to her headaches. Tr. at 488. Upon the ALJ's probing, she acknowledged that she got up to help her daughter get ready for school, took her to school or picked her up, went grocery shopping, fixed some meals, paid bills, and went to doctor's appointments. While these activities do not, in and of themselves, equate to the ability to work, the ALJ did not make any such determination. Rather, she assessed Blount's hearing testimony as not entirely forthcoming with regard to the limitations imposed by her headache pain. The ALJ also noted that Blountt testified at the hearing that her headaches cause blurry vision and eye pain, but that her medical records do not consistently reflect reports of such problems. Thus, the ALJ factored her assessment of Blountt's credibility into her overall analysis of the severity of Blountt's pain, as she is uniquely qualified to do.

She did not err in doing so.[8] The Court concurs that Blountt's testimony regarding blurry vision is generally inconsistent with her medical records. *E.g.*, Tr. at 384, 415. The ALJ's impression that Blount was evasive in answering questions regarding her daily activities is not for this Court to second-guess, where, as here, the ALJ gave good reasons for her determinations. *See also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Because the ALJ was in a better position to evaluate credibility, we defer to his credibility determinations as long as they were supported by good reasons and substantial evidence."). *Smith v. Heckler*, 760 F.2d 184, 187 (8th

---

[8] Blountt explains in her motion papers that she was nervous at the hearing, and may not have appreciated how to fully answer the ALJ's questions. While such could well be the case, this Court cannot supplant the ALJ's reasonably supported credibility assessments.

Cir. 1985) ("If inconsistencies exist in the record, the ALJ is permitted to disbelieve subjective testimony of pain.").

While not specifically cited by the ALJ, the Court finds further record inconsistencies detracting from Blountt's credibility. The Court notes that Blountt stated to Dr. Knight in early 2003 that she was "able to do her normal activities with them [the headaches] but finds that it is difficult to concentrate at times when she has the headaches." Tr. at 304. This is clearly inconsistent with her hearing testimony that she was essentially precluded from normal daily activity the majority of the week due to headaches. Further, when undergoing evaluation for bypass surgery in 2005, she stated that was looking for work. *Id*. at 356. This appears inconsistent with her application for disability benefits pending at the same time. More recently, in 2007, she stated that she walks two miles a day, five times per week. *Id.* at 473. This does not jibe with her testimony at the benefits hearing that she can only walk two blocks. *Id.* at 496.

### 2. Assessment of Medical Record

Blountt also argues that the ALJ improperly elevated the medical expert's opinion of the severity of her pain over the information found in her medical records. Specifically, Blountt takes issue with the following statement in the ALJ's decision:

> Dr Gedan reported that despite numerous examinations, the claimant has been described as in no distress and headaches were not noted in the record….

Tr. at 15. Blount asserts that this sentence is inaccurate, because her headaches are noted throughout her medical records.

Blountt mischaracterizes the ALJ's statement. The ALJ's statement, and the underlying testimony of Dr. Gedan, both refer to the fact that Blountt's medical records reflect that she regularly appeared at her medical reports in no apparent distress, as least in the eyes of her

11

physicians, and that she rarely reported experiencing a headache during those appointments. The Court does not view the ALJ's statement as a conclusion that the medical records fail to evidence Blountt's headaches altogether. To the contrary, the ALJ expressly found that Blountt suffers from headaches. Rather, Dr. Gedan and the ALJ found it inconsistent that Blountt claimed to experience severely debilitating headaches nearly every day, but that, nonetheless, her doctors consistently described her as not in distress and not experiencing a headache at the time of her appointments.

Accordingly, the Court does not find error in the ALJ's concurrence with Dr. Gedan on this point. The Court's review of the record confirms that at many, if not most, of Blountt's appointments, her physicians observed that she appeared in no distress and did not report experiencing headaches at the appointment. *E.g.*, Tr. at 277 ("appears comfortable"), 292 ("in no acute distress"), 294 ("in no apparent distress"), 297 ("in no apparent distress"), 304 ("in no distress while sitting at rest"), 383 ("She feels generally well."), 415 (same). Thus, substantial evidence exists in the record for the ALJ's observation. The Court acknowledges that Blountt could have been experiencing a headache at some of those appointments, but, for whatever reason, that fact did not make it into the medical records. But, the ALJ appropriately considered a pattern in the records as a whole, and this Court does not find that she lacked substantial evidence for her observations. Moreover, the apparent disconnect between Blountt's demeanor at her appointments and her statements regarding the severity of her condition is only one factor among many the ALJ weighed in assessing Blountt's credibility.

### 3. **ALJ's weighing of *Polaski* factors**

As an overarching matter, Blountt's points of error must be considered in light of the fact that the ALJ properly considered Blount's subjective complaints of pain in the context of the

12

entire record, including the objective medical evidence, Blountt's medication, physician opinions, her activities of daily living, and her work history. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. 416.929. Thus, the ALJ did not rely solely on her own personal observations of Blountt, or on Dr. Gedan's impression of her medical history. Rather, she properly weighed the *Polaski* factors and concluded that severity of Blountt's headache pain was not as great as she alleged.

In addition to the factors discussed above, the ALJ closely reviewed the medical evidence. She correctly noted that all objective testing and labs done on Blountt, including numerous CT scans and MRIs of her brain, a lumbar puncture, and blood work, returned completely normal results.

The ALJ also correctly noted that Blount frequently asked doctors to complete disability forms for her, and that, at times, they refused. The Court finds Blountt's visit to Dr. Knight in May 16, 2003 particularly troublesome. In that appointment, Blountt asked Dr. Knight to certify that she was completely unable to work before she had even tried to treat her headaches with medication. She was then "displeased" when Dr. Knight refused to do so.[9] The Court's review of the record also evidenced possible "doctor-shopping" with respect to the completion of forms. When Dr. Knight refused to complete disability forms for Blountt, she went to Dr. Cure, another primary doctor. He also refused, at least initially. She then went to Dr. Snyder.

The ALJ also noted that Blount rarely ever worked, even prior to the onset of her headaches in 2002. She appropriately noted that this factor weighed against Blountt. *Bradley v.*

---

[9] The record reflects a similar event in 2000. Blountt's asthma doctor wrote that "she [Blountt] got Nurse Marchetta to write her an excuse saying that she couldn't do her usual job which was clerical work because she also has to go on public transportation to get to work…. I think this lady has relatively mild but relapsing asthma. It certainly isn't severe enough to prevent her from working." Tr. at 206.

13

*Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) ("A lack of work history may indicate a lack of motivation to work rather than lack of ability.") (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In sum, the Court finds that substantial evidence supports the ALJ's assessment of Blountt's credibility. That assessment is properly the ALJ's province, not this Court's, provided nothing went seriously awry. That was not the case here. While the ALJ found Blountt's testimony regarding the intensity of her pain not entirely believable, she did not rely solely on her personal observations or those of Dr. Gedan. Rather, she carefully considered the numerous other factors set forth in the case law and regulations. After this consideration, she concluded that Blountt's assertions regarding the severity of her headache pain were overall inconsistent with the record, setting forth numerous good reasons for doing so. Substantial evidence supported her decision. Accordingly, this Court cannot disturb it.

### C. Psychological Consultation

Blountt further contends that the ALJ erred by not ordering a consultative examination to gather more information regarding Blountt's depression.

Blountt did not allege depression in her application for benefits. Tr. at 137. Nevertheless, the ALJ astutely noted that the medical records included psychological assessments of Blountt indicating that she suffered from depression. The ALJ, therefore, found that Blountt suffered from depression, and consequent "mild restrictions in her activities of daily living, mild difficulties in maintaining social function, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation." *Id.* at 14. The ALJ accommodated her depression-related restrictions by limiting her RFC to unskilled and no rapidly-paced tasks. *Id.* at 17.

Blountt argues that the ALJ was required to order a more current consultative exam to assess her depression.  As the ALJ noted, the record contains Dr. Stormo's assessment on June 24, 2004, done at the request of Dr. Taylor, the headache specialist.  Tr. at 316.  Dr. Stormo diagnosed Blountt as suffering from depression, but stated that testing reflected that it was "mild."  Tr. at 317.  Blountt also underwent a psychological assessment in September 2004 by Dr. Nelsen, a state agency consultant.  He also found that she was "mildly depressed."  Tr. at 331.  Blountt later saw Dr. Andersen on December 15, 2004, as part of the approval process for her gastric bypass surgery.  He approved her for the surgery, concluding that Blountt "presents as emotionally stable at this time; despite the presence of weight-related depression on Axis I…."  Tr. at 359.

The ALJ was only required to seek a further consultative opinion if the record was lacking.  *See* 20 C.F.R. §§ 416.912(f); 416.919a(b) (consultative exam appropriate where record does not provide adequate basis for decision).  It was not.  She thoroughly considered the opinions of three doctors regarding Blountt's psychological status.  Those opinions were uniform in concluding that Blountt's depression was mild.  The Court's review of the record does not suggest otherwise.  Nor does Blountt point out anything that does.  Under such circumstances, the ALJ was not required to seek out further evidence regarding Blountt's psychological condition.  *Id.  See also Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) ("The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim."); *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order

medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").[10]

## III. CONCLUSION

The ALJ's decision to place little weight on treating neurologist Dr. Snyder's opinion was based on substantial evidence. Dr. Snyder's statements that Blountt was "disabled" were conclusory, dated at the time of the hearing almost two years later, and inconsistent with other record evidence. The ALJ's weighing of Blountt's complaints of pain followed *Polaski* and was supported by good reasons evidenced in the record. The ALJ was not required to order a psychological consultation regarding Blountt's depression where the record was adequately and uniformly developed in that regard.

## IV. RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

---

[10] Blountt originally raised a fourth issue regarding the adequacy of the vocational expert's testimony at the benefits hearing. Specifically, she argued that he did not adequately explain the basis for his testimony regarding the number of jobs available to Blountt based on the sit/stand option the ALJ incorporated into Blountt's RFC. *Plaintiff's memo. in support of motion for summary judgment*, pp. 9-10. Blountt did not mention this argument in her most recently filed brief, suggesting its abandonment. In any event, it is unavailing. The ALJ limited Blountt to "sitting six hours total out of eight hours, standing/walking four hours each out of eight hours with a brief change of position after 30 minutes…." Tr. at 17-18. The vocational expert explained at the hearing that, while the Dictionary of Occupational Titles did not describe the sit/stand option for the jobs he recommended, his testimony regarding that option was based on his "personal knowledge and analyses of the jobs performed. These are industries in which I tend to have many accounts and tend to assist in the modification or the placement of individuals within that job." Tr. at 535. Blountt's attorney did not question or object to his testimony regarding the sit/stand option at the hearing, but questions it now. The Court finds that the vocational expert adequately set forth his basis for his testimony regarding the sit/stand option. *See Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (exact match with Dictionary of Occupational Titles not required; "DOT definitions are simply generic job descriptions that offer the appropriate maximum requirements for each position, rather than their range….") (quotation and citation omitted).

    A.    Plaintiff's motion for summary judgment (Doc. No. 8) be **DENIED**.

    B.    Defendant's motion for summary judgment (Doc. No. 13) be **GRANTED**.

    C.    This case be **DISMISSED WITH PREJUDICE**.

Dated: July 28, 2008.

                              s/ *Jeanne J. Graham*
                              _____
                              JEANNE J. GRAHAM
                              United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **August 11, 2008**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.